**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

September 1, 2022

**VIA ECF**

Honorable Judge Laura Taylor Swain
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

   Re: **United States v. Selassie Sinclair,**
      21 Cr. 52 (LTS)

Dear Judge Swain:

     In the year and seven months since Selassie Sinclair's arrest in the instant case, he has defied all of the odds. Despite facing severe intellectual disability, mental health crises, and pretrial home incarceration while in a shelter, Mr. Sinclair has found steady employment, completed programming, and maintained full compliance with Pretrial Services. Mr. Sinclair's achievements are even more impressive when examined under the lens of his young age. Mr. Sinclair, who is now 22 years old, has worked hard to overcome a childhood shadowed by academic and social instability due to his severe intellectual disabilities. At the time of the instant case, Mr. Sinclair was living in a shelter with his family, while battling anxiety and the impacts of his demonstrated cognitive and social deficits. As a result, Mr. Sinclair – who has an ▮▮▮▮▮ rendering him easily manipulated by others and lacking the cognitive ability to be the mastermind of these events – regrettably followed behind the other two armed codefendants in this case and committed the instant offenses.

     As with other challenges he has faced, Mr. Sinclair has reflected deeply about the factors that brought him to where he is today. He is committed to staying on the right path and has been in full compliance with his Pretrial Services conditions for the past year and seven months – most of which was spent living in a shelter sharing a room with three family members while under home incarceration. For the reasons set forth more fully below, including the impact of his intellectual disabilities on the nature of the crime, his exceptional compliance to the most restrictive terms of pretrial release, as well as his commitment and efforts to better himself, I respectfully request that Your Honor sentence Mr. Sinclair to time served with a term of supervised release in this case.

**Background**

Mr. Sinclair was born on June 26, 2000 in Bedford-Stuyvesant, NY to LaToya Jeffers. From birth, Mr. Sinclair faced difficult circumstances. He did not have any relationship with his father, and was raised in a home with his grandmother, brother, aunt, twin brother and his mother, who predominantly provided financial support for the family. Mr. Sinclair and his brother, however, did have a positive relationship with their stepfather, and were deeply impacted by his illness and eventual death. Although his mother was consistently employed, Mr. Sinclair did not have much financial stability growing up, and would often get bullied in school.

His experiences were further exacerbated by his learning/intellectual disabilities. Mr. Sinclair attended grade school at P.S. 44, located close to his home at that time. He required assistance with all of his classes, and received an Individualized Education Plan (IEP) in both middle and high school. Mr. Sinclair was also enrolled in Integrated Co-Teaching class (ICT) which has students with disabilities learn with general education students for math and English Language Arts, while receiving both individual and group counseling on a weekly basis. His school had recommended that he receive multiple accommodations, including providing personalized mini-lessons, ample opportunities for repetitions and review, highly structured environments, praise, rewards and opportunities for feeling successful, clear boundaries and limit setting, and counseling to address lack of self-control.

Although Mr. Sinclair received one-on-one help and met weekly with a school counselor, he experienced significant difficulty with maintaining attention and did not complete high school. In addition, multiple transfers between schools made it even more difficult for him to excel academically. Mr. Sinclair also dealt with anxiety on a regular basis. Throughout his childhood, he would only leave his home when accompanied by his family and was scared of his environment.

Mr. Sinclair currently lives in a shelter with his mother, with whom he is close, and his younger sister and brother, with whom he often spends his days playing with and assisting his mother by caring for them. Since his January 2021 arrest, Mr. Sinclair's anxiety and depression have worsened significantly, primarily due to his home incarceration. Mr. Sinclair, who had been living in a small apartment in a shelter where he and his three other family members shared a single bedroom, spent 24 hours a day in that room for nearly a year. As such, it is of little surprise that on December 26, 2021, after almost on a year on home incarceration under such difficult circumstances, Mr. Sinclair was admitted to Interfaith Medical Center after his mother called 911 for mental health intervention. [redacted]

Despite these setbacks and the limitations of home incarceration, Mr. Sinclair has made enormous progress towards his future goals. Indeed, Mr. Sinclair was not deterred by his initial inability to leave his apartment and participated in remote programming opportunities at Get Out Stay Out (GOSO) soon after his arrest. Once Mr. Sinclair received a bail modification to allow

him to attend in person programming, Mr. Sinclair quickly began attending in person sessions at GOSO.  At GOSO, Mr. Sinclair has participated in and completed a variety of life skills courses, including  anger management, fatherhood/men's group, art therapy, yoga, "Time's Up" – a current events group, Cipher – a rap group, as well as other programming.  As his GOSO social worker, Keenan Shoulders, explains:

> Since working with Selassie, I have witnessed immense growth in his demeanor and behavior. Selassie remains in regular communication with his Social Worker and responds to his Social Worker attempts at outreach. Selassie would continue to benefit from his work with GOSO. Once he becomes an alumni of the program, he would serve as a model example on how an individual makes changes in their lives.

Ex. B.  In addition to his work with GOSO social workers, Mr. Sinclair has also been meeting with Ava Burstyn, a social worker at our office.  While Ms. Burstyn worked with Mr. Sinclair on employment and programming opportunities, she also worked through Mr. Sinclair's mental and emotional health struggles:

> Mr. Sinclair has demonstrated tremendous growth in the short period I have known him. When we first met, Mr. Sinclair was discernibly depressed and dealt with low self-esteem. As our professional relationship developed, Mr. Sinclair has been forthcoming about his mental health struggles. He has shared with me his struggles with depression, anxiety, and an intellectual disability. He expressed a desire to use our sessions to emotionally process some of the challenges he has overcome and to focus on his mental health moving forward. We focused the supportive counseling component of our work together on talk therapy and identifying healthy coping strategies for dealing with his mental health issues.

Ex. C.

      In addition to programmatic opportunities, Mr. Sinclair has remained invested in finding employment opportunities for himself.  Indeed, as soon as this Court modified Mr. Sinclair's bail conditions to home detention to allow him to seek employment, Mr. Sinclair immediately began applying for available positions.  Eight days later, Mr. Sinclair secured a position as a service assistant at iPic Fulton Street Theatre where he still works to this day.  However, Mr. Sinclair's interest in obtaining employment was unsurprising given his consistent employment from a young age.  Since he was 15 years old, Mr. Sinclair has maintained jobs or participated in employment programs made available to him through the City.  The bail modification permitting Mr. Sinclair to work allowed him to reintroduce this part of himself that he had lost through continued home incarceration under such stressful circumstances.  Mr. Sinclair has remained grateful to this Court for the opportunity to work.

Mr. Sinclair's interest and investment in self-improvement throughout this process has been apparent through his efforts in finding employment, his work at GOSO, as well as his individual work with Ms. Burstyn. Should he receive a sentence of time served, Mr. Sinclair looks forward to continuing this path of success he has forged for himself.

### Intellectual Disability

Although Mr. Sinclair has made significant progress since his arrest over a year and a half ago, it was readily apparent to our office that Mr. Sinclair suffered cognitive deficiencies that needed further evaluation. Accordingly, our office retained a psychologist, Dr. Edward Fernandez, to better understand Mr. Sinclair's mental health and cognitive functioning and provide potential treatment recommendations. Dr. Fernandez conducted his evaluation over the course of several months, culminating in a 11-page psychological report. Mr. Sinclair's intellectual functioning was assessed using the Wechsler Adult Intelligence Scale–4th Edition (WAIS-IV), and he achieved a Full-Scale IQ (FSIQ) of ███████████████ ███████████████████████. *See* Dr Fernandez's Evaluation attached as Ex. E.

The FSIQ is composed of performance scores on tests measuring verbal comprehension, perceptual reasoning, working memory and processing speed. As Dr. Fernandez's evaluation stated,



Ex. E.

Mr. Sinclair's verbal reasoning abilities as measured by the Verbal Comprehension Index (VCI) are ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Dr. Fernandez also outlined that Mr. Sinclair presents with symptoms of ██████ 

4

███████████████████████████████████████████████

## Instant Case

As set forth in the complaint, the instant arrest was the product of an investigation into Mr. Sinclair for conspiracy to commit Hobbs Act Robberies and brandishing of a firearm, in violation of 18 U.S.C. §§ 1951, 924(c), and 2. On or about November 29, 2020, and on or about December 2, 2020, Mr. Sinclair, his twin brother Judah, and Jose Arroyo-Rivera, who lived in the same shelter in the Bronx, New York, were implicated in three robberies in the Bronx. As the complaint described, they would drive in a dark-colored SUV – operated by Arroyo-Rivera, the mastermind of the robberies – to a commercial establishment, and at least two of the men would get out of the SUV, and enter the establishment to steal money from the store's cash register. During the first robbery ("Robbery-1"), Mr. Sinclair entered the grocery store with his brother, Judah. Per the video surveillance, at some point Mr. Sinclair and Judah left the grocery store. A few minutes later, Judah, followed by an armed Arroyo-Rivera, reentered the grocery store. Judah accessed the cash register while Arroyo-Rivera pulled the woman outside while pointing the gun at her. In the video surveillance, Mr. Sinclair is not observed to be present in the store at the time of Arroyo-Rivera's entry or while Judah acquired the money from the cash register. For the following two robberies, Mr. Sinclair and Judah – while Arroyo-Rivera awaited the two boys in his car – entered the grocery stores alone at Arroyo-Rivera's direction. At no point is Mr. Sinclair ever observed carrying a gun or any other weapon.

As Mr. Sinclair expresses in his letter, he accepts full responsibility for his actions and understands the seriousness of the current situation:

> I deeply apologize, and I'm sorry for what I did. It wasn't right and I should not have done it. Every day of my life, I regret it. I wish I could make that decision over, and every day I pray for forgiveness.

Ex. A. He deeply regrets the lack of judgment he showed through his misconduct. He is embarrassed by his behavior, and is frightened by the prospect of incarceration. He recognizes that he has disappointed his family and undermined his ability to serve as a role model for his sister and younger brother. Altogether, Mr. Sinclair counts this experience as the worst in his life.

## A Sentence of Time Served With Supervised Realease is Appropriate in this Case

Congress requires District Courts to impose a sentence that is "sufficient, <u>but not greater than necessary</u> . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a) (emphasis added). The Second Circuit has explained that, "[i]n deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment . . . a sentencing judge must have a generosity of

spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

When determining the appropriate sentence, District Courts must consider the Federal Sentencing Guidelines, but need not abide by them. *See United States v. Booker*, 543 U.S. 220, 264 (2005). District Courts vary or depart from the guidelines quite frequently -- in fact, the majority of federal sentences are now outside of the guidelines range. *See* U.S. Sent'g Comm'n, Quarterly Sentencing Updates, available at https://www.ussc.gov/research/data-reports/quarter/quarterly-sentencing-updates. The U.S. Sentencing Commission's preliminary report for 2021 found that guidelines sentences were imposed in only 43.1% of cases nationally, and just 19.5% of cases in the Southern District of New York. *See id.* This trend has been stable over the past several years. Since 2013, SDNY judges have consistently sentenced approximately 75% of their defendants outside of the guidelines range. *See id.*

In this case, a downward variance is appropriate. Specifically, we respectfully request a sentence of time served plus a term of supervised release. Such a sentence is warranted because it will account for Mr. Sinclair's lesser role in the conspiracy, his young age, the aberrational nature of his conduct, his extraordinary success while released on pretrial supervision, and his cognitive and mental health issues.

### A. The Advisory Guidelines

Mr. Sinclair has pleaded guilty to conspiracy to commit Hobbs Act robberies pursuant to a plea agreement. All parties agree that he is therefore subject to a base offense level of 28, and a total offense level of 25 for his fully accepting responsibility. *See* PSR ¶ 32-59. With a total criminal history score of zero, Mr. Sinclair falls in Criminal History Category I. PSR ¶ 62-63. The guidelines, therefore, yield 57-60 months. PSR ¶ 86. While probation recommends a downward variance to 54 months, this is variance is insufficient and remains unnecessarily punitive. PSR at p. 29. For the reasons detailed below, the guidelines sentence and probation's recommendation for only a six-month variance would be inappropriate and result in a greater than necessary punishment. *See Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original).

### B. The crimes committed are not indicative of who Mr. Sinclair was before the offense nor of how he has lived his life since the offense.

While these offenses are undoubtedly serious, they are aberrant when taken in the context of Mr. Sinclair's life as a whole, both before and after the offense. *See* 18 U.S.C. § 3553(a)(1). The instant case marks Mr. Sinclair's first criminal conviction – one that he will feel the ramifications of through the loss of civil privileges as well as through his restitution payments. He has been consistently employed since he was 15 years old despite facing serious mental health and developmental issues. He has also been of great assistance to his mother in helping take care of his younger sister and younger brother whenever needed. Ex. D at 1. None of this has changed since Mr. Sinclair's arrest. In fact, in the year and seven months since his arrest, Mr.

Sinclair has successfully risen to the challenge, as he has throughout his life, of working and assisting his mom even when dealing with his own time of crisis. He has worked and helped care for his younger siblings and has continued to do so while the country has been locked down due to COVID-19.

Mr. Sinclair is well aware that the many successes he has enjoyed in his life and his ability to be with his family come from following the rules. Yet in the instant offense, Mr. Sinclair's age and cognitive limitations, which make it difficult to turn down requests from others, especially if it involves his twin brother, caused Mr. Sinclair to lose sight of everything that was at stake. This case, and everything Mr. Sinclair stands to lose, has made the enormous cost of his decision to break the law clear. Mr. Sinclair has grown from his offense and returned to the hardworking person that most know him to be.

Since his arrest, Mr. Sinclair has not only reflected on the callousness of his offense, he has also succeeded at living a law-abiding life. He has had time to think about everything he stands to lose and appreciate the importance of unfailingly abiding by the law.  Mr. Sinclair's prosecution and the very fact of jeopardizing his own life and future is sufficient deterrence for Mr. Sinclair.[1]

As his conformity with the terms of his pretrial release demonstrates, incarceration is not necessary to ensure Mr. Sinclair's ongoing respect for the law. Per Mr. Sinclair's current Pretrial Services Officer John Moscato, Mr. Sinclair "has been compliant with his location monitoring conditions since his release."  PSR ¶ 6.  Additionally, during a phone call with Mr. Sinclair's first Pretrial Services Officer Mohammed Ahmed, Officer Ahmed informed defense counsel that Mr. Sinclair has performed "better than anyone on [his] caseload" under incredibly strict and difficult conditions given his residence at a shelter.  Indeed, Officer Ahmed expressed how impressed he was that Mr. Sinclair, who is still incredibly young, has been able to abide to such restrictive pretrial conditions while residing in a shelter, noting that one "rarely see[s] that."  Additionally, Officer Ahmed explained that during his supervision of Mr. Sinclair, he has remained in constant communication with Mr. Sinclair's mother, who has been incredibly supportive and communicative throughout the process. Indeed, Mr. Sinclair has the full support of his family to ensure that he remains on the right path moving forward. Mr. Sinclair's compliance with pretrial services proves his ability and willingness to immediately begin complying with the terms of supervised release were the court to impose a noncustodial sentence. PSR ¶ 6.

Taken against the backdrop of Mr. Sinclair's life as a whole, a sentence of time served plus three years' supervised release coupled with restitution payments will justly reflect Mr. Sinclair's conduct both before and after the offense, while fairly accounting for the gravity of Mr. Sinclair's conduct.

---

[1] *See Five Things About Deterrence*, Nat'l Inst. of Just. (June 5, 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence (finding, based off of empirical research, that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment" and that "prison sentences (particularly long sentences) are unlikely to deter future crime") (emphasis in original).

## C. A noncustodial sentence will properly account for Mr. Sinclair's role in the offense.

Mr. Sinclair conspired to commit three robberies with his twin brother and another co-conspirator, Jose Arroyo-Rivera. Mr. Sinclair takes full responsibility and is deeply sorry for his actions. *See* Ex. A. Notwithstanding his participation in a serious offense, Mr. Sinclair's role was much less involved than that of his codefendants. Because Mr. Sinclair's charge of conviction does not reflect his lesser involvement given his guidelines range, a noncustodial sentence, therefore, is the only opportunity to reflect Mr. Sinclair's lesser role in the offense. *See Williams v. Illinois*, 399 U.S. 235, 237 (1970) ("The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences.").

In determining whether to grant a downward variance, courts has previously taken into account a defendant's role in an offense even where the defendant did not receive a mitigating or minor role reduction under the Sentencing Guidelines. *United States v. Deaza-Alcala*,15 Cr 321, ECF No. 320, at *9, 26 (S.D.N.Y. Mar. 2, 2017) (Woods, J.). Granting a downward variance to a conspirator in *Deaza-Alcala*, the Court cited the fact that the defendant "may have taken guidance from . . . a more culpable member of the conspiracy." *Id.* at *26. The Court "considered that relative culpability" in "varying downward . . . significantly from the guidelines range." *Id.*; *see also United States v. Deaza-Alcala*, 2019 WL 2208839, at *5 (S.D.N.Y. May 22, 2019) (describing, during post-conviction proceedings, the Court's downward variance at sentencing as, in part, "a result of the defendant's culpability relative to that of other conspirators"). Similarly to *Deaza-Alcala*, Mr. Sinclair's relatively lesser role in this case calls for a downward variance in his sentence.

As with the defendant in *Deaza-Alcala*, Mr. Sinclair was not the mastermind behind the conspiracy – nor did he have the capacity to be – and was brought into the conspiracy by and took directions from more culpable members. On the day of the first robbery, Mr. Sinclair was not even present in the store when his codefendants brandished a firearm and robbed the store. While Mr. Sinclair was present in the store for the remaining two robberies with his twin brother, the defense submits that it was still at the direction of codefendant Arroyo-Rivera, who awaited the two boys in his BMW. Not only was Mr. Sinclair not the mastermind behind the offense, there was nothing indispensable about Mr. Sinclair's participation to his co-conspirators' plans. This further demonstrates his lesser culpability and supports a downward variance. *See United States v. Vicente Fernandez*, 321 F. Supp. 2d 522, 525 (S.D.N.Y. Mar. 31, 2004) (holding that the defendant's played a minor role in a conspiracy given that he was "essentially fungible"); *United States v. Sanchez*, 925 F. Supp. 1004, 1013 (S.D.N.Y. 1996) (analyzing the "defendant's importance to the success of the venture" in deciding the importance of their role in a conspiracy). Significantly, at no point was Mr. Sinclair observed carrying a firearm or any other weapon during the course of the robberies.

Moreover, Mr. Sinclair's role occurred in the context of a relatively unsophisticated conspiracy. As with Mr. Sinclair's lesser culpability, the Court should take the conspiracy's lack of sophistication into account in fixing Mr. Sinclair's sentence. *See* 18 U.S.C. § 3553(a)(1); *cf. United States v. Sarvestani*, 297 F.R.D. 228, 230 (S.D.N.Y. Jan. 22, 2014) (Gardephe J.) (explaining that the sentence imposed for an offense in violation of 18 U.S.C. § 371 "was based on . . . the level of deception," the defendant's "central role in the offense," and "his high level of sophistication"); *United States v. Kurland*, 718 F. Supp. 2d 316 (S.D.N.Y. May 26, 2010) (rejecting the defendant's request for a noncustodial sentence in part because the defendant engaged in a "sophisticated scheme").

Mr. Sinclair's relatively lesser role within an unsophisticated conspiracy, supports what Mr. Sinclair's life history shows: Mr. Sinclair is unlikely to reoffend. The unlikelihood that Mr. Sinclair will engage in this type of behavior again calls for a downward variance. *See* 18 U.S.C. § 3553(a)(2)(B); § 3553(a)(2)(C); *see also United States v. Williams-Bethea*, 18 Cr 78, Dkt. No. 155 at *31 (S.D.N.Y. May 8, 2019) (Nathan, J.) (granting a 20-month downward variance for a defendant convicted of violating 18 U.S.C § 371 partly on the grounds that the defendant was "a first-time offender [and] there's nothing in the record to indicate that she is likely to reoffend").

Nonetheless, Mr. Sinclair knows that his less significant role in an unsophisticated conspiracy in no way excuses his conduct. He sees now that, no matter his love for his twin brother, he should never have participated in a robbery and he will never put himself in the position to make the same decision again. A noncustodial sentence would properly recognize both the nature of the offense and Mr. Sinclair's role therein.

### D. Mr. Sinclair's Young Age Warrants a Downward Variance

At the time of the instant offense, Mr. Sinclair was 20 years old. The current Guidelines range is inappropriately harsh as it fails to consider Mr. Sincalir's youth at the time of his current offense – an important consideration when fashioning a sentence.

The Supreme Court has time and again recognized "the mitigating qualities of youth" to be considered at sentencing *Miller v. Alabama*, 567 U.S. 460, 476 (2012) (holding that mandatory life without parole for juvenile offenders was unconstitutional in all cases) (internal quotation marks omitted). "'[Y]outh is more than a chronological fact.' It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.' And its 'signature qualities' are all 'transient.'" *Id.* (citations omitted). The Supreme Court noted that these conclusions rest "not only on common sense—on what 'any parent knows'—but on science and social science as well." *Id.* at 471.

"Recent studies on the development of the human brain conclude that the human brain development may not become complete until the age of twenty-five . . . ." G*all v. United States*, 552 U.S. 38, 58 (2007) (quoting with approval lower court's sentencing determination). "The

frontal lobes, homes to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." Johnson, et al., Adolescent Maturity and the Brain, J. Adolescent Health 2009, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/.

In 2014, the National Institute of Justice ("NIJ"), the research, development and evaluation agency of the U.S. Department of Justice, conducted research on juvenile and young adult offenders and concluded that "young adult offenders ages 18–24 are more similar to juveniles with respect to their offending, maturation and life circumstances." *See* NIJ, From Juvenile Delinquency to Young Adult Offending (2014), available at https://nij.ojp.gov/topics/articles/juvenile-delinquency-young-adult-offending. Recommendations included the establishment of "special courts for young offenders ages 18–24" and an "'immaturity discount' for young offenders that would involve a decrease in the severity of penalties, taking into account a young person's lower maturity and culpability." *Id.*

Because punishment and retribution relate to an offender's blameworthiness, the case for harsh punishment is not as strong with a young person as with an older adult. *See Montgomery v. Louisiana*, 577 U.S. 190, 207 (2016). As such, Mr. Sinclair's young age at the time of the commission of the offense must be considered in fashioning a fair and just sentence in the instant case. Since the current Guidelines range does not account for Mr. Sinclair's youth at the time of the offense, a sentence below the recommended range is appropriate.

### E. Mr. Sinclair's traumatic life circumstances & cognitive and emotional deficiencies are reasons to impose a sentence of time served.

As described in detail above, Mr. Sinclair's life has been rife with trauma and setbacks. This history is a reason to grant a variance to time served. <u>See</u> 18 U.S.C. § 3553(a)(1). In spite of all of these obstacles, Mr. Sinclair remains a steadfast and loving person, who is kind-hearted and caring for his loved ones. *See* Ex. D.

Even more critical than his life circumstances are Mr. Sinclair's cognitive limitations. In *Atkins v. Virginia*, 536 U.S. 304, 316 (2002), the Supreme held that "impaired intellectual functioning is inherently mitigation" not that "our society views mentally retarded offenders as categorically less culpable than the average criminal." *Tennard v. Dretke*, 542 U.S. 274, 287 (2004). This makes good policy sense. People with intellectual disabilities "by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others" and thus "they, bear [diminished . . . personal culpability." *Atkins*, 536 U.S. at 318.

10



     Mr. Sinclair's cognitive disability and mental health issues warrant a nonincarceratory sentence.  Not only does this diagnosis mitigate his culpability, but it also sheds light on the further trauma and abuse Mr. Sinclair would likely suffer if imprisoned.  At the very least, imprisonment would deprive him of the necessary resources and support he has received since his arrest to address these issues and will continue to receive in the future.

## **Conclusion**

     Justice would not be served by giving Mr. Sinclair a term of incarceration in this case. He suffers from severe intellectual disabilities, and the offense conduct in this case demonstrates that he is not a criminal mastermind. Indeed, he is a young man, who was taken advantage of in what he recognizes was the worst mistake in his life. Mr. Sinclair has been fully compliant with the conditions of his pretrial release for the past year and a half, and has been receiving support from a social worker in our office.

     Mr. Sinclair's year and seven months in home incarceration, and later home detention, have been more than sufficient to deter him from any future criminal conduct. Simply put, Mr. Sinclair will never do anything like this again.  According to Dr. Fernandez, Mr. Sinclair would benefit from interventions targeted towards dynamic needs that contributed to the circumstances of his current involvement with the justice system. He described Mr. Sinclair as appearing to be "motivated regarding behavioral change," and stated that he would benefit from involvement in a program such as YAI – a program that "offer[s] children and adults with intellectual and developmental disabilities a comprehensive range of services." *See* https://www.yai.org/. None of these interventions would be available to Mr. Sinclair if incarcerated.  We believe that with continued supervision, programming, and employment, Mr. Sinclair will continue thriving.  A term of incarceration will only stop this progress.

     Thank you for your consideration of this request.

     Very Truly Yours,

/s/ *Marisa K. Cabrera*
Marisa K. Cabrera
Assistant Federal Defender
Federal Defenders of New York

Cc:  AUSA Sarah Kushner